### INTERNATIONAL BANKING CORPORATION v. McGRAW TIRE & RUBBER CO. et al.

### ROBERT MORRIS TRUST CO. v. SAME.

(Circuit Court of Appeals, Sixth Circuit.    January 9, 1919.)

#### Nos. 3167, 3168.

1. PLEDGES ☞44—PLEDGOR—RIGHTS OF.
   A debtor, who has pledged nonnegotiable security, and who is not chargeable with notice that the creditor has parted with the security so pledged, may pay his debt to the creditor and thereby become entitled to the return of the security, and the risk is carried by a transferee thereof, who has not given notice of his rights thereto; but where the creditor has the right to repledge, and the original debtor is chargeable with notice that such retransfer has been made, if he pays without obtaining return of the property, he does so at the risk of being compelled to satisfy the claim of the second transferee.

2. PLEDGES ☞44—PLEDGOR—NOTICE.
   Where defendant, to obtain advances, assigned its accounts receivable to a broker, and the assignments gave the broker the right to repledge the accounts, held, that defendant was chargeable under the circumstances with notice that the broker had repledged the security, and it repaid the broker the amount of the advances, without procuring the assignments, at its peril.

3. PLEDGES ☞44—REASSIGNMENT—EFFECT.
   Though defendant's assignment of accounts receivable recited that it was contemplated that the pledgee might reassign the same as collateral security for a loan to defendant, and the pledgee reassigned the accounts, obtaining the loan himself and advancing the amount to defendant, held that, where defendant repaid the pledgee amount of the advances without

obtaining a return of assignments or protecting banks which made the advances to the pledgee, the assignments should be treated as allowing the course of dealing pursued by the pledgee.

4. PLEDGES ⬅️44—REASSIGNMENT—EFFECT.

Where defendant assigned accounts receivable to secure advances, and the assignments authorized repledge, the fact that defendant, as the accounts matured, made payments to its assignee, the pledgee, without receiving return of the assignments, etc., did not warrant defendant in paying the entire indebtedness to the pledgee without taking any steps to learn whether the accounts had been reassigned and protect those to whom the accounts may have been reassigned.

5. PRINCIPAL AND AGENT ⬅️105(2)—AUTHORITY OF AGENT—IMPLICATIONS.

A broker, who borrowed from banks sums which he advanced to defendant, the loan being secured by defendant's pledge of accounts receivable, which he reassigned to the bank, *held* not to have implied authority to receive payment on behalf of the banks of the entire loan, which amounted to over $200,000, because the banks allowed him to receive payments of relatively small sums as the accounts fell due.

6. PLEDGES ⬅️42—PLEDGER—NOTICE.

Where defendant, to obtain advances, assigned its accounts receivable to a broker, who, as authorized, reassigned them to banks, *held* that, as the assignments contemplated such retransfer, the banks were not bound to give notice to defendant of their rights.

Appeals from the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Bill by the International Banking Corporation against the McGraw Tire & Rubber Company and others, together with a bill by the Robert Morris Trust Company against the same defendants. From decrees dismissing the bills, complainants appeal; the appeals being consolidated. Decrees reversed and remanded, with directions.

The McGraw Tire & Rubber Company desired to borrow money. One Dockendorf, of New York, holding himself out as a banker, proposed to advance the desired funds upon the security of pledges of the McGraw Company's accounts receivable. An elaborate written contract, covering the details of this situation, was executed by both parties, and business under it was carried on for several years. Dockendorf borrowed money, some from the International Banking Corporation and some from the predecessor of the Robert Morris Trust Company (hereafter called the banks), and these funds he forwarded to the McGraw Company (hereafter called the defendant). In order to obtain such advances from Dockendorf, and acting in pursuance of the contract, the practice of the defendant was to take a copy of the invoice which it had sent to its customer, indorse thereon an assignment to Dockendorf, and send it to him. All these assignments of account were made upon a prepared form. The face of the form was headed: "Certificate of Indebtedness. Below is a true and correct copy of invoice rendered for goods sold and delivered." Upon the back was a formal assignment, with the stipulations hereafter mentioned, which was signed by the defendant. This certificate of indebtedness Dockendorf reassigned and pledged to the banks as security for the advances which the banks made, and which Dockendorf sent to defendant.

On April 10, 1914, the defendant determined to discontinue this method of business; an accounting with Dockendorf was had, and it was found that the advances unpaid to that date amounted to $207,216. This sum it paid Dockendorf, and took from him a blanket release of all indebtedness and reassignment of his interest in all accounts receivable which had been transferred to him. The banks did not participate in, nor have any knowledge of this settlement, and retained possession of all the certificates of indebtedness which

Dockendorf had turned over to them. Defendant made no demand or effort looking to the getting in of any of these outstanding certificates. Thereafter, as each account receivable became due and within the agreed time thereafter, Dockendorf paid to the banks the amount of the advance which had been made upon the pledge of that account. This course of business he continued until early in July. He then suspended such payments, and never made any more. At that date the balance unpaid and owing to the banks was about $105,000 and interest. No part of this sum has been paid.

The main contract between defendant and Dockendorf provided that the assignments of the accounts receivable to be made from the McGraw Company to Dockendorf "shall be prepared in such form and shall include or be accompanied by such representations, guaranties, and agreements as the party of the second part [Dockendorf] shall from time to time direct." Each assignment so indorsed upon the "certificate of indebtedness" contained these provisions, among others:

"It is mutually agreed that the party of the second part [Dockendorf] shall have full power to reassign the accounts receivable, and that such accounts receivable shall be and remain the sole property of the party of the second part or his assigns, with unlimited authority to sell, assign, pledge, repledge, collect, compromise, compound, extend, or convert into bills receivable with or without security."

"The undersigned hereby constitutes and appoints said John E. Dockendorf his true and lawful attorney irrevocably for it and in its name and stead, but to his own use and benefit, to sell, assign, transfer, set over, pledge, compromise, or discharge the whole or any part of the aforesaid claim or account. * * * The undersigned, knowing that this account is to be reassigned by John E. Dockendorf to a financial institution or person, and is to be given to said financial institution or person as collateral security for a loan to be made to the undersigned, for the express purpose of inducing said institution or person, to which it may be assigned by John E. Dockendorf, to pay this money and to make the said loan to the undersigned, does hereby make the following representations to both John E. Dockendorf and the said financial institution, or person: * * * (5) That if any checks or money due on the acount hereby assigned shall at any time come to the undersigned, such checks or money shall be accepted by the undersigned as the property of the institution or person lending the money hereon and to be immediately transferred to John E. Dockendorf."

After April 10, the sundry debtors in the accounts represented by the certificates of indebtedness, which early in July remained unredeemed in the hands of the banks, and which certificates and assignments purported to be security for this sum of $105,000, paid these various sums in checks or money to the defendant in an amount exceeding $105,000. Thereupon, after demand and refusal, the banks filed these bills in the court below to enforce the alleged trust created by clause 5, seeking decrees compelling the defendant to account for and pay over to the banks the proceeds of such accounts to the amount of the bank debts. The bills were dismissed by the trial court upon the final hearing, and the banks bring these appeals. Upon those aspects of the case which we treat as controlling, the rights of the two banks are entirely analogous, and it becomes unnecessary to consider such distinctions as there may be with reference to other aspects.

John H. Watson, Jr., of Cleveland, Ohio, for appellants.

Wm. L. Day, of Cleveland, Ohio (Squire, Sanders & Dempsey, of Cleveland, Ohio, L. M. Kyes, of East Palestine, Ohio, and Thomas M. Kirby, of Cleveland, Ohio, on the brief), for appellees.

Before WARRINGTON and DENISON, Circuit Judges, and McCALL, District Judge.

DENISON, Circuit Judge (after stating the facts as above). The trial court concluded that the controlling question was as to the debtor

and creditor relationship of the parties. In a thorough and careful opinion, it was concluded as matter of fact that this relationship did not exist between the banks and the defendant, but that it was the debtor of Dockendorf, and Dockendorf was the debtor of the banks, and it was therefore held that the defendant had the right to pay Dockendorf in full this indebtedness to him and be discharged therefrom, and was under no duty to require him to surrender any outstanding securities which it had theretofore pledged to him. There are many considerations in the written contract and in the course of business tending to support this conclusion of fact. There are other items of proof looking in the contrary direction. We cannot regard this question of fact as controlling, and we therefore pass it by without discussion, assuming, for the purposes of this opinion, that the trial court was right.

[1] We think the vital question is that of notice. It is not to be disputed that a debtor, who has pledged with his creditor any nonnegotiable security, whether tangible property or choses in action, and who is not chargeable with notice that the creditor has rightfully parted with the security so pledged, may pay his debt to his creditor and thereby become entitled to the return of his security, and that, under those conditions, the risk is carried by the second transferee of the property who has not given notice of his rights.[1] It must be equally clear that, where the creditor, who had received this pledge, has a right himself to repledge or retransfer the property for his own benefit, and where the principal debtor is chargeable with notice that such retransfer has been made, if he pays his debt without obtaining the return of the property pledged, he does so at the risk of being compelled to satisfy the claim of the second transferee in order to get his property back.

[2] In order to determine the question of Dockendorf's right to transfer these accounts over to the banks and the question of notice to the defendant on or before April 10 that such transfer had been made, it is only necessary to refer to the contract provisions above quoted, and especially to clause 5 and the provision quoted just before that clause. It is not easy to conceive a more express and complete admission by defendant of notice of the assignments in question. It seems clear to us that, in the face of this contract, the defendant cannot be heard to say that it is not chargeable with notice that Dockendorf had made that very reassignment for the purpose of making which it had made the assignment to him. Certain it is that only a clear case of justifiable belief by the defendant

---

[1] There is a class of cases of pledge, with power in the pledgee to repledge on his own account,—as is common with stockbroker and customer,—where the second pledgee's title is sustained even after satisfaction of the first pledge. In stating the rule above, we assume that in this class of cases, the owner, paying his own debt, is chargeable with notice of the second pledge, because of the authority given, the failure to produce and return the property pledged or the custom of the business. Whether or not this assumption as to their reasoning is correct, it has not seemed necessary now to consider or decide the claim of the banks to relief upon the analogy of the rule in these stockbroker cases.

that Dockendorf still retained the accounts and had not transferred them could support the theory that it was not chargeable with notice of his transfer. Instead of such a clear case, we find that, when the defendant made the payment of $207,216, it was advised that Dockendorf might have transferred these accounts, and that, therefore, its only safe course was to require the surrender of the certificates of indebtedness, and then was further advised that there would be no serious danger in paying Dockendorf, because, if he did not use the money to redeem outstanding certificates, he would be guilty of embezzlement. Of course, there could be no embezzlement unless the certificates belonged to some one else. From the fact that Dockendorf did not simultaneously produce and return these certificates, the very natural inference would arise that he had disposed of them elsewhere; and, indeed, we cannot read the testimony of the president of the defendant otherwise than as containing substantial admission that he took it for granted that Dockendorf might have used more or less of these certificates somewhere, from time to time, in connection with obtaining from some one more or less of the funds advanced, and that defendant relied upon Dockendorf to use the $207,000 to redeem the certificates as the accounts matured, in so far as there might be such outstanding certificates. Under these conditions, it must be held that the defendant is chargeable with notice of the assignments which had been made to the banks.

[3] We note two criticisms of this result, which require comment. The provision quoted just before clause 5, by its very words, referred to an expected transfer to some person or financial institution, to serve as security for a loan "to be made to the undersigned." It is said that these transfers by Dockendorf to the banks were to secure loans to Dockendorf, and hence were not within the scope of the notice to be inferred. We cannot think this a substantial distinction. The loans in question were, in ultimate effect, made by the banks to the defendant through Dockendorf, even though no privity of contract arose between original lender and ultimate borrower. The precise expected form of doing business had been departed from, but the substance was the same, at least as to the reasonable inferences regarding notice. The issue is not whether knowledge or express notice by the defendant is established; the issue is whether, under all the facts and circumstances, there was enough to put the defendant on notice that the accounts had been transferred; and we are satisfied that there was enough.

[4] The other criticism is that the course of business, continued for a long time, justified the defendant in disregarding any notice it might otherwise be thought to have and in treating the accounts as belonging to Dockendorff. This course of business as to current payments by defendant to Dockendorf is not shown by the record, but there seems no reason to doubt that it took the natural and expected path, and that from time to time defendant computed the amounts which it had received in payment of assigned accounts and sent its check to Dockendorf for the amount loaned thereon, and that he receipted for the same. The record does show that he did not return the certificates of

indebtedness which this payment would operate to redeem. We find nothing in this course of business justifying any belief that Dockendorf was not assigning over the accounts "to some person or financial institution," as the agreement contemplated he should do. Even if it may have been the custom for defendant to pay Dockendorf round sums from time to time, without reference to specific accounts, or yet to remit the full amount of accounts collected, this would not interfere with charging against defendant that notice which is here the vital thing. The contract expressly provided that, in spite of the transfer over by Dockendorf of an account, the amount thereof, when it was paid, should be remitted by the defendant to Dockendorf; and the fact that business was done pursuant to this arrangement or somewhat variant therefrom cannot avail to escape the effect of a notice declared by the contract. The practice not to return the redeemed certificates may have legitimate bearing on the issue, but it cannot control. As is pointed out hereafter, whenever an account was paid by the principal debtor to the defendant, the outstanding certificate of indebtedness ceased to represent anything; there was nothing to return.

[5] The remaining vital question (which presents itself) is whether Dockendorf was so far the agent and representative of the banks in the subject-matter that the payment of the $207,000 to him must be considered as a payment to the banks. The idea that such agency existed is more or less inconsistent with the theory that there.was no obligation from the defendant to the banks; but, for the purpose of ascertaining the merits of the contention, we overlook any such inconsistency. The claim rests upon clause 5 above quoted. Whenever an assigned account was paid to the defendant, the proceeds were to be remitted to Dockendorf. The banks knew of this arrangement, and, by accepting the certificates of indebtedness with this agreement indorsed, they acquiesced. Clearly, Dockendorf became their agent for this purpose; but did the scope of his agency extend to receiving for the banks, from the defendant, out of its funds, payment for the loans secured by the assignment of the unmatured accounts? Receiving such payment is clearly not within the letter of the authority; and we are compelled to think that it was also outside of the spirit and substance of the agency.

In reaching this conclusion, we are not inclined to accept as controlling the mere distinction between a debt due and a debt not due, although it is true enough that agency to receive payment when due does not necessarily, or perhaps generally, imply agency to collect before due. If the claim of lack of authority were reduced to the bare proposition that, although Dockendorf would represent the banks in receiving payment from the defendant on its specific debt if due yesterday, yet he would not bind the banks by receiving payment of the same debt if due to-morrow, it would in this case stand on rather narrow ground. There are two reasons much more forceful than this mere distinction: The first is found in the improbability that there would have been any actual intent to give such great authority as was here assumed. It appears to be the fact that Dockendorf, although

he called himself a banker, was really a broker, finding customers who wanted to borrow money in this way and then finding banks who would lend it. There is no proof as to his financial responsibility, and no reason to suppose that the banks would not be ordinarily prudent in dealing with him. These assigned accounts were mostly in amounts of less than $1,000. They were due and would be paid from time to time. The liability in favor of the banks that would accrue against Dockendorf under clause 5 would be for only such ones of these items as might accumulate during the short time for which returns by him to the banks could be suspended without attracting inquiry or investigation. A few thousand dollars would seem to be the total liability naturally to be expected; but if the agency extended to receiving payments from the defendant of its total debt at any time, the liability then would reach very large sums. In fact, it amounted to more than $200,000. That the banks should have intended to trust Dockendorf with receiving a few thousand dollars for them, to be turned over to them from day to day in the regular course of business, would be entirely probable; that they would intend to make him their agent to receive $200,000 and entirely close up the whole line of business and under circumstances where he could retain a large part of the amount, as it turned out more than $100,000, for more than 60 days without discovery by the banks, would be distinctly improbable. An agency of the larger scope must be supported by clear proof before its existence can be rightly inferred.

The other reason lies in the clear distinction between the two classes of transactions. The account assigned to the banks was a chose in action; it was property, and it stood as a valuable security. The moment the account was paid by the debtor to the defendant, the property or security which had been assigned to the bank disappeared from existence. There was nothing for the bank to assign back either to Dockendorf or to the defendant. The claim of the bank attached, instead, to the proceeds. These were the property of the bank, in the hands of defendant or of Dockendorf. With regard thereto, the banks had the rights of ownership, whatever complications might develop. Wherever the trust fund could be followed, it could be recovered. Payment made by the defendant on its own account was a different thing. The security—the debt assigned—continued in existence. It would be expressly, or by operation of law, retransferred to the defendant. The situation covered by clause 5 had not arisen and never could arise. The agency created by this clause was to receive for, and transmit to, the banks specific items of property already belonging to them. The agency now alleged against the banks was to collect for them, in effect by the sale of their pledged security, large sums at a time and in a manner never contemplated. We think it clear that the two agencies are so dissimilar that the creation of the first does not imply the existence of the second.

[6] Much is said about the lack of notice from the banks to defendant, and the proposition is urged that, where the creditor has made successive assignments of the same chose in action, the assignee who first gives notice to the debtor gets the better title. We agree with

the District Court that the cases cited upon this proposition are not pertinent. They deal wholly with the right to recover against the debtor in the account which is assigned, and they have no application to a case where a creditor assigns accounts and then buys them back again. In such case, the only question must be whether he is, at the latter time, chargeable with notice that there has been an intermediate transfer to some one else; and this question we have considered.

Upon the general equities between the parties, the relative position of the defendant is—to say the least—not strong enough to justify hesitation in enforcing the applicable rules. It is fairly to be assumed that the defendant did not wish the assignments to be known to its debtors, and that Dockendorf did not wish the defendant and the banks to come into direct communication with each other. In both these desires all the parties acquiesced. The banks received assignments duly executed by defendant and expressly reciting that the accounts were assigned by the defendant for the purpose of being assigned to some bank. The only object of notice from the banks to defendant would have been to prevent action by the defendant, based on the supposition that the accounts had not been assigned, and in the face of this recital there was no object remaining for a notice to serve. We do not see any negligence on the part of the banks; on the other hand, the conduct of the defendant in making payment without getting in the certificates of indebtedness was most extraordinary and in violation of the rules of ordinary business prudence.

The complainant in each case is entitled to a decree in accordance with the prayer of the bill, and, accordingly, both decrees are reversed, and both cases are remanded for such proceedings.